UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CABOT MICROELECTRONICS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | 11 C 3673 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| DAVIES IMPERIAL COATINGS, INC., DON | ) | |
| DAVIES, and JOANN DAVIES, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Cabot Microelectronics Corporation ("CMC") manufactures various types of

slurry, a liquid material used in chemical mechanical planarization, a polishing process that

removes materials from and reshapes components used in semiconductor chips and other high

technology devices. Defendant Davies Imperial Coatings, Inc. manufactures metal oxide

dispersions that can be used either as slurry themselves or as intermediate products in the

manufacture of slurry. Defendants Donn Davies and JoAnn Davies are officers of Davies

Imperial Coatings. The three defendants are referred to collectively as "Davies."

On October 27, 1998, CMC and Davies entered into a Services Agreement under which

CMC was to purchase "Services" consisting mainly of the "manufacturing of the metal oxide

dispersions set forth on Schedule A hereto (the 'Products')." Doc. 29 at ¶¶ 19-20; Doc. 29-1 at 3.

The Agreement imposed an annual minimum purchase requirement on CMC. Each "Term Year"

("TY"), CMC was required to "purchase Services from Davies for not less than the lesser of (i)

two million (2,000,000) gallons of Product or (ii) fifty percent (50%) of the total amount of

-1-

orders received by [CMC] for Products for shipment to customer locations in North America."
Doc. 29 at ¶ 23; Doc. 29-1 at 3-4. As shown by its use of the terms "Product" and "Products,"
the minimum purchase requirement applied only to dispersions listed on Schedule A. The
Agreement terminated on August 4, 2010, and CMC's minimum purchase obligation accordingly
was prorated for TY10. Doc. 29 at ¶ 24; Doc. 29-1 at 26.

The parties agree that CMC complied with the minimum purchase requirement for TY99
through TY05. Doc. 29 at ¶ 24. CMC contends that it satisfied its obligations for TY06 through
TY09, though it admits that it fell short in TY10 and owed Davies a shortfall payment of
$300,837. Doc. 29 at ¶¶ 34-39; Doc. 29-5; Doc. 29-6 at 2. After the Agreement terminated,
CMC sent Davies a check for $234,793—the shortfall payment minus a $66,044 credit owed to
CMC by Davies. Doc. 29 at ¶¶ 40-41. Believing that CMC did not satisfy the minimum
purchase requirement for TY06 through TY09 and that CMC miscalculated the shortfall payment
owed for TY10, Davies rejected the $234,793 check. Doc. 29 at ¶ 42; Doc. 45 at ¶¶ 34, 37, 39.
CMC filed this suit seeking a declaratory judgment that it satisfied the minimum purchase
requirement for TY06 through TY09 and correctly calculated the TY10 shortfall payment.

Before the court is CMC's motion for summary judgment. In support, CMC has
submitted audited accounting records of all Products it shipped to customers in North America
("Total Products") and all Products that it purchased from Davies and shipped in North America
("Davies Products"). Doc. 29 at ¶¶ 25-34; Doc. 29-5. According to these records, the ratio of
Davies Products to Total Products exceeded 50% for TY06 through TY09, thus satisfying the
Agreement's minimum purchase requirement. Doc. 29-6 at 2. As for TY10, CMC's Senior
Supply Manager's calculated the ratio of Davies Products to Total Products as 12.8%, resulting

in CMC purchasing $300,837 less than it should have during that Term Year.  Doc. 29 at ¶¶ 35-39; Doc. 29-5 at ¶¶ 12-15; Doc. 29-6 at 2.

Davies disputes CMC's calculations.  Doc. 45 at ¶¶ 21, 34, 37, 39.  Its principal argument is that CMC wrongly failed to include the sales of two dispersions, Semi-Sperse D7000 and WA-11, when calculating the Total Products figure.  While admitting that Semi-Sperse D7000 and WA-11 were not listed on Schedule A, Davies maintains that they are materially identical to two other dispersions—Semi-Sperse 11 and WA-9, respectively—that are listed on Schedule A.  It follows, according to Davies, that the Total Products calculation should include CMC's sales of Semi-Sperse D7000 and WA-11.  If those sales were included, CMC's shortfall for TY06 through TY10 would amount to $1,345,857.01.  Doc. 43-1 at ¶ 11.

To support its view that Semi-Sperse D7000 "appears to be essentially the same product [as] Semi-Sperse 11," Davies points to the products' respective Material Safety Data Sheets ("MSDSs").  Doc. 43-1 at ¶ 10.  The MSDSs show that Semi-Sperse D7000 is composed of less than 10% amorphous silica, less than 1% potassium hydroxide, and greater than 89% deionized water, and that Semi-Sperse 11 is composed of less than 11% amorphous silica, less than 1% potassium hydroxide, and greater than 88% deionized water.  Doc. 44-1 at Exs. I, J.  To support its submission that WA-11 is materially identical to WA-9, Davies argues that WA-11, which is composed of 11% alumina and 89% water, is simply a more concentrated version of WA-9, which is composed of 9% alumina and 91% water.  CMC at one point purchased WA-9 from Davies and diluted it to a 4% to 7% alumina dispersion for use in manufacturing other slurries.  CMC later began producing WA-11 and diluting it to the same 4% to 7% alumina dispersion that it previously created from WA-9 purchased from Davies.  Doc. 43-1 at ¶ 6.  Davies contends that

because WA-11 served precisely the same function as WA-9—both were diluted to a 4% to 7% alumina dispersion—the two are indistinguishable for purposes of the Agreement. *Id*. at ¶¶ 6-8, 14-15.

CMC responds that Semi-Sperse D7000 and WA-11 are physically different from Semi-Sperse 11 and WA-9—Semi-Sperse D7000 has about 1% less amorphous silica by weight than Semi-Sperse 11, and WA-11 has a 2% higher concentration of alumina than WA-9. In so arguing, CMC sidesteps the critical issue in this case, which is whether those physical differences are *material* for purposes of calculating CMC's minimum purchase obligations under the Agreement. Suppose that CMC produced or acquired from another vendor a product that differed from WA-9 by less than one part per million. Could CMC disregard sales of that product based on that difference? What if the difference was one part per billion? At some point, a product is so similar to WA-9 that it must be treated as WA-9 under the Agreement. The same holds for Semi-Sperse 11.

CMC's summary judgment papers present no argument regarding how similar is similar enough, or how different is different enough, for purposes of determining whether a particular substance is materially identical to a product listed in Schedule A. Nor does CMC present evidence regarding the real-world, practical differences (if any) between WA-11 and WA-9, or between Semi-Sperse D7000 and Semi-Sperse 11, that would justify treating the substances differently for purposes of the Agreement. *See* Doc. 47 at 9 ("If this case proceeds to discovery, CMC *can and will* explain why the concentration levels make a material difference in processing finished products.") (emphasis added). CMC thus has failed to establish as a matter of law that it

properly excluded WA-11 and Semi-Sperse D7000 when calculating its minimum purchase obligations.

To grant summary judgment on this record would countenance a potential violation of the implied covenant of good faith and fair dealing imposed by Massachusetts law, which governs the Agreement. Doc. 29-1 at 13. The implied covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *See Liss v. Studeny*, 879 N.E.2d 676, 680 (Mass. 2008) (internal quotation marks omitted). This principle prohibits CMC from evading its minimum purchase obligations by excluding dispersions materially identical to those listed in Schedule A. *See* Restatement (Second) Contracts, § 205 cmt. d, Illustration 1 (1981) ("A, an oil dealer, borrows $100,000 from B, a supplier, and agrees to buy all his requirements of certain oil products from B on stated terms until the debt is repaid. Before the debt is repaid, A makes a new arrangement with C, a competitor of B. Under the new arrangement A's business is conducted by a corporation formed and owned by A and C and managed by A, and the corporation buys all its oil products from C. The new arrangement may be found to be a subterfuge or evasion and a breach of contract by A."). It follows that CMC, the movant here, cannot prove that it complied with the Agreement without first showing that WA-11 materially differs from WA-9 and that Semi-Sperse D7000 materially differs from Semi-Sperse 11. *See Employers' Reins. Co. v. Mass. Mut. Life Ins. Co.*, 654 F.3d 782, 794 (8th Cir. 2011) (implied covenant is violated where one party performs "in a manner that evades [the contract's] spirit and is unfaithful to its purpose, resulting in a denial of the justified expectations of the other party") (Connecticut law). As explained above, CMC has not done so.

From the premise that the Agreement gave it the right to unilaterally modify Schedule A, CMC argues that it could have removed WA-9 and Semi-Sperse 11 from Schedule A, which in turn would have defeated any suggestion that it violated the Agreement by excluding WA-11 and Semi-Sperse D7000 from its minimum purchase calculations. Doc. 47 at 10. The argument's premise fails, at least at this stage of the litigation, because it is not clear that CMC had the unilateral right to remove WA-9 and Semi-Sperse 11 from Schedule A. The Agreement provided in relevant part that CMC "may amend Schedule A from time to time on 30 days written notice to Davies *provided* such amendments either do not result in a material increase in cost to Davies or are agreed to in advance by Davies." Doc. 29-1 at 3 (second emphasis added). The present record does not suggest, let alone indisputably establish, that removing WA-9 and Semi-Sperse 11 from Schedule A would not have resulted in material cost increases to Davies.

For these reasons, CMC's motion for summary judgment is denied. This ruling is without prejudice to CMC attempting to establish at the appropriate juncture that, for purposes of the Agreement, Semi-Sperse D7000 and WA-11 are not materially identical to Semi-Sperse 11 and WA-9, respectively, or that CMC could have unilaterally removed Semi-Sperse 11 and WA-9 from Schedule A.

April 3, 2012

_____
United States District Judge